1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| KENNETH DAVID WEST and ROBERT TAYLOR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | No.<br><br>CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |
| --- | --- |

CLASS ACTION COMPLAINT
Case No.



1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     JURISDICTION .................................................................................... 6

III.    VENUE .................................................................................................. 6

IV.     PARTIES ............................................................................................... 6

        A.      Plaintiffs ................................................................................... 6

        B.      Defendant .................................................................................. 7

V.      STATEMENT OF FACTS .................................................................... 7

        A.      Amazon Operates the Dominant Online Retail Sales Platform and
                Dominates the Online Retail Sales Market in The United States. ....... 7

        B.      Amazon Imposes Most Favored Nation Requirements On Third-
                Party Merchants. ..................................................................... 13

        C.      Amazon's Pricing Policies Restrain Price Competition and Cause
                Consumers to Pay More. ......................................................... 20

        D.      Government Authorities Have Repeatedly Concluded That
                Amazon Has Harmed Competition Through the Use of Most
                Favored Nation Pricing Policies. ............................................. 21

VI.     INTERSTATE TRADE AND COMMERCE .............................................. 25

VII.    RELEVANT MARKETS ..................................................................... 25

VIII.   CLASS ACTION ALLEGATIONS ..................................................... 29

IX.     ANTITRUST INJURY ........................................................................ 31

X.      CAUSES OF ACTION ......................................................................... 32

FIRST CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT (15
        U.S.C. § 1) *PER SE* .................................................................... 32

SECOND CAUSE OF ACTION  VIOLATION OF 15 U.S.C. § 1
        (ALTERNATIVE TO *PER SE*) .................................................... 34

THIRD CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT –
        MONOPOLIZATION (15 U.S.C. § 2) ......................................... 36



FOURTH CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT –
    ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) ...................................................... 37

JURY TRIAL DEMANDED ...................................................................................................... 38

PRAYER FOR RELIEF ............................................................................................................ 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT - ii
Case No.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiffs allege the following on personal knowledge with respect to themselves and their acts, and on information and belief with respect to all other matters based on the investigation made by their attorneys.

## I.      INTRODUCTION

1.      Amazon.com, Inc. ("Amazon") operates the largest online retail platform in the United States, which includes its website, applications for mobile devices, and voice-controlled devices ("Amazon's platform").  Sales on Amazon's platform make up between 50% and 70% of all online retail sales in the United States. By comparison, the shares of Amazon's nine closest competitors range from 1.1% to 6.6% of that market.

2.      Amazon operates as a retailer by selling directly to its customers. In this role, Amazon sells approximately 12 million products on its platform, encompassing a wide range of consumer goods.

3.      Amazon has also designed its platform to be a marketplace where Amazon customers can buy products from other retailers ("third-party merchants"). Third-party merchants may register with Amazon Marketplace for consumers to buy their products on Amazon's platform. When an Amazon customer buys an item listed by a third-party merchant, Amazon collects a fee for the use of its platform, which it deducts from the purchase price before remitting the remainder to the third-party merchant. Amazon therefore competes both with other online retail sales platforms, such as eBay, Walmart, and Wayfair, for the business of third-party merchants, and with third-party merchants who list their products on Amazon's platform.

4.      The overwhelming majority of third-party merchants selling on Amazon's platform also sell on competing platforms, including their own websites and the platforms offered by companies like eBay, Walmart, and Wayfair. Amazon imposes significant fees for the use of its platform, including a subscription fee and percentage fees on the sale of each product (commissions that it calls "referral fees"). Amazon's total fees are substantially higher than the fees charged by other platforms, especially platforms with no fees at all, such as the

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

third-party merchants' own websites. Third-party merchants incorporate Amazon's fees into their pricing on Amazon's platform. In a competitive market, third-party merchants would charge a total price on other platforms that is lower than the price charged on Amazon's platform, because the other platforms take a lower fee. However, Amazon uses its market power to prohibit this form of price competition.

5.      Every third-party merchant that registers to sell products on Amazon's platform "agrees to the terms of the Amazon Services Business Solutions Agreement (BSA) and the policies incorporated in that agreement."[1] The BSA establishes rules for setting prices on Amazon's platform.

6.      Before March 2019, Amazon required its third-party merchants to agree to Amazon's "Price Parity Clause." The Price Parity Clause (also known as a "Most Favored Nations" clause or "MFN" clause) explicitly prohibited third-party merchants from offering consumers lower prices on any alternative online platform, including their own websites. An investigation by the Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary found that "Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party merchants can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[2]

7.      Amazon's Price Parity Clause restricted and suppressed price competition in two ways.

8.      *First*, the Price Parity Clause prohibited third-party merchants from lowering their prices on other online retail sales platforms. But for Amazon's MFN clause, Amazon's

---

[1] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (Jul. 13, 2018), *Kangaroo Mfg., Inc. v. Amazon.com*, Case No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75 ("Irwin Decl."), ¶ 4. Amazon also has a limited number of stand-alone agreements with certain third-party merchants, who are not subject to the Standard Business Agreement. For example, Amazon has a separate agreement with certain publishers to sell their eBooks directly to customers on Amazon's platform. *See* Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/. Amazon's anticompetitive agreements with these eBooks publishers is the subject of a separate class action. *See Fremgen v. Amazon.com, Inc.*, Case No. 1:21-cv-351-GHW-DCF (S.D.N.Y. filed January 14, 2021).

[2] Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary (Oct. 6, 2020), *available at* https://kl.link/3jGISfK.



higher fees would result in consumers paying a higher overall price on Amazon's platform than on competing platforms.  Competitive pressure would then have forced Amazon to lower its fees.  By eliminating price competition across platforms, Amazon protected its ability to charge supracompetitive fees for the use of its platform, keeping prices high on its platform and, therefore, across all online retail sales platforms.

9.      *Second*, Amazon eliminated horizontal price competition between its own goods and the directly competing goods of the third-party merchants that would otherwise have been sold at lower prices, not only on competing online platforms and the merchants' websites, but also on Amazon's platform. Without the Price Parity Clause, Amazon would have had to offer lower prices for its own goods to compete with the lower-priced third-party-merchant goods.

10.     In both cases, the anticompetitive contractual obligations that Amazon imposed on the third-party merchants increased the prices paid by Amazon customers for goods purchased on its platform. Those contractual restraints resulted in supracompetitive prices being charged on Amazon's platform for the goods of both third-party merchants and Amazon—prices that could not have been sustained in the absence of anticompetitive contracts.

11.     Multiple regulators have recognized the anticompetitive nature of Amazon's MFN clause. In 2012, regulators in the U.K. and in Germany[3] concurrently investigated the anticompetitive effect of Amazon's MFN clause in the U.K. and German online retail sales markets.[4] Concerned that Amazon's MFN clause could drive up online prices for consumers, the U.K. regulators opened a formal investigation after receiving "numerous complaints" that Amazon prohibited third-party merchants from selling their products at lower prices through other online platforms, including the merchants' own websites.[5] Considering the "national market" for online retail sale platforms, the German regulators found that Amazon's MFN

---

[3] Specifically, the regulators were the U.K. Office of Fair Trading and regulators in Germany's Federal Cartel Office, the Bundeskartellamt.
[4] Dan Prochilo, UK May Drop Antitrust Probe into Amazon Pricing Policy, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy. OFT closed in 2014 and was succeeded by the newly created Competition and Markets Authority.
[5] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

clause amounted to a "horizontal price-fixing" agreement that acts as a "barrier[] to market entry for new competitors and hinder[s] the expansion of existing competitors in the market."[6] They further found that the MFN is "a hardcore restriction in that it limits price-setting behaviour, [which] cannot be seen either as an indispensable restriction, or as an appropriate way of involving consumers with regard to its price-raising effect."[7] In short, they concluded that the MFN clause has anticompetitive effects with respect to both third-party merchants and other retail sales platforms because it "results in safeguarding Amazon's large own-account share of sales as a competitor and the extensive reach of amazon.de, which cannot be attacked by competing platforms."[8]

12.     Amazon continued to employ its MFN clause in the United States until March 2019. Under threat of a Federal Trade Commission (FTC) investigation, Amazon also officially withdrew its MFN clause in the United States.

13.     But the withdrawal was merely sleight of hand. Amazon continues to enforce its price restraint under its so-called "Fair Pricing Policy." The new policy states that, if a third-party merchant engages in pricing practices with regard to "a marketplace offer that harms customer trust," Amazon may impose sanctions. According to Amazon, a third-party merchant commits a "pricing practice that harms consumer trust" if it sets a price for its goods on a competing online retail sales platform that is significantly below the price charged for the goods on Amazon's platform.

14.     The sanctions imposed on third-party merchants for charging consumers a lower price on a competing platform are severe:  They include eliminating a product's "Buy Box" button, which is a feature that makes a product the most visible on the product-detail page and the easiest for consumers to purchase; removing the third-party merchant's offering from the Amazon Platform; suspending shipping options; and terminating or suspending the third-party merchant's ability to have any goods sold on Amazon's platform.

---

[6] 12.09.13 Bundeskartellamt Decision at 3.
[7] *Id.*
[8] *Id.*

15. Amazon uses the sanctions under its Fair Pricing Policy "as a way to penalize sellers that offer products at a lower price on competing sites." House Report at 296. For example, the suspension of a third-party merchant's account has "dire consequences for the seller" and was cited by the Congressional Investigation as an "egregious example" of Amazon's bullying of third-party merchants. *Id.* And the elimination of the "Buy Box" button from the third-party merchant's listing is devastating to the merchant's business because 80% of the purchases on Amazon's platform are made with the "Buy Box."

16. Third-party merchants cannot afford to avoid the onerous conditions of Amazon's Fair Pricing Policy because Amazon has massive and durable market power. Amazon's "market power is at its height in its dealings with third-party merchants." House Report at 15. As a result of Amazon's market power, third-party merchants are "forced to be on Amazon" and believe they "don't have a choice but to sell through Amazon." House Report at 87, 270.

17. Amazon regularly and aggressively monitors the prices offered by its third-party merchants on other online platforms, routinely using computer software to scan the price listings of its third-party merchants on competing online websites. This is done to determine whether its third-party merchants are violating its euphemistically named "Fair Pricing Policy."

18. The intent and effect of the Fair Pricing Policy is the same as the former Price Parity Clause. Under both policies, Amazon uses its market power to prevent third-party merchants from selling their products at lower prices on other online platforms.  This, in turn, allows Amazon both to charge higher fees for the use of its platform and to charge higher prices for the Amazon products it sells on its platform.

19. Ultimately it is consumers who suffer harm by paying higher prices (1) for products purchased from third-party merchants through online retail sales platforms other than Amazon's platform,[9] (2) for products purchased from third-party merchants on Amazon's platform, and (3) for purchases of Amazon's own products.

---

[9] *See Frame-Wilson v. Amazon*, Case No. 2:20-CV-00424-RAJ (W.D. Wash) (filed March 19, 2020).

CLASS ACTION COMPLAINT - 5
Case No.



## II.     JURISDICTION

20.     This Court has subject matter jurisdiction over Plaintiffs' Sherman Act and Clayton Antitrust Act claims because they arise under federal law. *See* 28 U.S.C. §§ 1331, 1337; 15 U.S.C. §§ 1, 2, 15(a).

21.     Plaintiffs are residents of Illinois and Connecticut. As described in this Complaint, Plaintiffs purchased consumer goods online through Amazon's platform and suffered financial harm because of Amazon's anticompetitive conduct.

22.     This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, and has registered with the Washington Secretary of State.

## III.     VENUE

23.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

## IV.     PARTIES

**A.     Plaintiffs**

24.     Kenneth David West is a resident of Mount Prospect, Illinois.  He has regularly shopped on Amazon's platform, starting as early as 2006.  For example, he made the following purchases on Amazon's platform: on August 27, 2019, he purchased for $79.99 a HelloBaby video baby monitor with camera and audio B07MZ1J93Y, which was listed by Amazon's co-conspirator, third-party merchant Jing Rui Mei; on March 20, 2020, he purchased for $27.90 an amplified HD digital TV antenna, which was listed by Amazon's co-conspirator, third-party merchant Abask Tech; on November 2, 2020, he purchased for $33.94 an LG basket assembly part B00NAP58ZE, which was listed by Amazon's co-conspirator, third-party merchant Part Supply House; on April 13, 2021, he purchased for $199.99 a Hunter sonic indoor ceiling fan B00FGM503O, which was listed by Amazon itself; and on December 8, 2020, he purchased for $249.99 a Little Tikes indoor/outdoor inflatable bouncer B08CXDCLD2, which was also listed



by Amazon itself. Mr. West has been injured and will continue to be injured by paying more for products than he would have paid or would otherwise pay in the future in the absence of Amazon's unlawful acts, as set forth herein.

25.     Robert Taylor is a resident of New London, Connecticut. He regularly buys goods on Amazon's platform. For example, he made the following purchases on Amazon's platform: on December 30, 2017, he purchased for $589 a Rado Coupole men's quartz watch R22625113, which was listed by Amazon's co-conspirator, third-party merchant Imperial 123; on January 3, 2018, he purchased for $950 a Rado Coupole men's watch R22531723, which was listed by Amazon's co-conspirator, third-party merchant Promenadewatches; on June 20, 2019, he purchased for $919.09 Dolce e Gabbana men's black leather sneakers CS1570AZ388HNF57, which was listed by Amazon's co-conspirator, third-party merchant Dolce e Gabbana; on May 13, 2020, he purchased for $688.99 a Rado men's Centrix diamond Swiss quartz watch, which was listed by Amazon's co-conspirator, third-party merchant Global Precious Brands, LLC; on April 8, 2019, he purchased for $39.99 a CLI-281 black, cyan, magenta and yellow 4 ink pack, which was listed by Amazon itself. Mr. Taylor has been injured and will continue to be injured by paying more for products than he would have paid or would otherwise pay in the future in the absence of Amazon's unlawful acts, as set forth herein.

**B.     Defendant**

26.     Amazon is an online retail giant with its principal headquarters in Seattle, Washington. Amazon sells its own products directly to retail customers. Amazon also allows third-party merchants to sell products on its online retail sales platform.

## V.     STATEMENT OF FACTS

**A.     Amazon Operates the Dominant Online Retail Sales Platform and Dominates the Online Retail Sales Market in The United States.**

27.     Amazon operates the largest online retail sales platform in the United States.  As the name implies, an online retail sales platform is a combination of websites and mobile applications that allow consumers to find and purchase products offered online by retailers.



1  Sales on Amazon's platform make up between 50% and 70% of all online retail sales in the

2  United States.

3        28.     Amazon operates as a retailer on its own platform by selling directly to its

4  customers. In this role, Amazon sells approximately 12 million products on its platform,

5  encompassing a wide range of consumer goods.

6        29.     But Amazon has also designed its platform to be a marketplace where Amazon

7  customers can buy products from other retailers ("third-party merchants"). Third-party

8  merchants may register with Amazon Marketplace to sell products on Amazon's platform.

9  Amazon therefore competes both with other online retail sales platforms—such as eBay,

10  Walmart, and Wayfair—for the business of third-party merchants, and with third-party

11  merchants who sell their products on Amazon's platform.

12        30.     A third-party merchant's relationship with Amazon begins with a $40

13  registration fee that allows it to reach 95 million unique visitors per month in the United

14  States.[10] But third-party merchants "have to play by Amazon's rules, and Amazon.com isn't just

15  a marketplace, it's also a seller."[11] Amazon deducts a commission (or "referral fee") from the

16  price of each item sold on its platform, typically around 15%.[12] Optionally, and for an additional

17  fee, third-party merchants may select Fulfillment by Amazon (FBA) for Amazon to store

18  products, pack and ship orders, collect payments, and manage customer service and returns.

19  Many third-party merchants enroll in FBA because it costs less to have Amazon handle these

20  aspects of the business.[13] Third-party merchants that enroll in FBA qualify for Amazon Prime

21  and free-shipping-eligible orders; other third-party merchants that want the benefit of Amazon

22  Prime must join a waitlist for Seller Fulfilled Prime, which commits third-party merchants to

23        [10] Amazon Services Registration Page, https://services.amazon.com/semlanding.

24  html?ref=pd_sl_2thvswwc79_b&hvdev=c&ld=SEUSSOABING-
    B20000SCD&hvadid=78615157546872&hvqmt=p&tag=mh0b-20&hvbmt=bb.

25        [11] Leanna Zeibak, *7 Steps to Winning the Amazon Buy Box in 2019*, Tinuitu (Aug. 14, 2018),
    https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

26        [12] David Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, Jungle Scout (Feb. 7,
    2020), https://www.junglescout.com/blog/amazon-fba-fees/.

27        [13] *Id*.

28

CLASS ACTION COMPLAINT - 8
Case No.

1   fulfilling orders with two-day deliveries at no additional charge to Prime customers.[14] Accepting

2   FBA services also greatly increases the likelihood that the third-party merchants' products will

3   be selected for the coveted Amazon Buy Box, which makes products most visible on the

4   product-detail page and the easiest for consumers to purchase.[15]

5          31.   Referral fees are not paid by third-party merchants to Amazon up-front; instead

6   Amazon deducts them from customers' payments before Amazon remits payments to the third-

7   party merchants.

8          32.   The overwhelming majority of third-party merchants selling on Amazon's

9   platform also sell on competing platforms, including their own websites and the platforms

10   offered by companies like eBay, Walmart, and Wayfair. Amazon imposes fees for the use of its

11   platform that are substantially higher than the fees charged by other platforms—especially third-

12   party merchants' own websites, which have no fees at all. In a competitive market, third-party

13   merchants would charge a total price on other platforms that is lower than the price charged on

14   Amazon's platform, because the other platforms take a lower fee. However, Amazon uses its

15   market power to prohibit this form of price competition.

16          33.   Every third-party merchant that registers to sell products on Amazon's platform

17   "agrees to the terms of the Amazon Services Business Solutions Agreement (BSA) and the

18   policies incorporated in that agreement." The BSA establishes rules for setting prices on

19   Amazon's platform.

20          34.   Amazon has monopoly power in the online retail sales market in the United

21   States. As of 2018, 50% of online retail sales in the United States took place on Amazon's

---

[14] Reach hundreds of millions of Amazon customers worldwide-fast, Amazon Seller Central, https://sellercentral.amazon.com/; Sell products with the Prime badge directly from your warehouse, Amazon Seller Central, https://services.amazon.com/services/seller-fulfilledprime.html.

[15] *Supra* Zeibak.



platform.[16]  Amazon's market share has been increasing over the past five years, as shown by the growth of its sales.[17]



35.    Aided by its anticompetitive conduct, Amazon has increased its market share in the online retail sales to "65% to 70% of all U.S. online marketplace sales."[18]

36.    Those increases have largely been driven by third-party merchant sales, which account for the majority of sales on Amazon's platform.[19]

---

[16] *Amazon Now Has Nearly 50% of US Ecommerce Market*, Emarketer (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[17] J. Clement, *U.S. Amazon marketplace sales 2016-2019*, Statista, Jun 12, 2019, https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.

[18] House Report at 255.

[19] Laureen Thomas & Courtney Reagan, *Watch out, retailers. This is just how big Amazon is becoming*, CNBC, www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



37.     Amazon's monopoly power is further confirmed by its power to control the prices of a vast number of goods offered for sale in the U.S. online retail sales market.

38.     Amazon has even greater monopoly power in the market for online retail sales *platforms*. In light of the volume of sales that takes place on Amazon's platform, the overwhelming majority of retailers have no choice but to list their products on Amazon's platform.  Amazon's power is reinforced by the fact that Amazon's platform provides access to Amazon's 147 million Prime members in the United States.[20]  To put that into perspective, more Americans have Amazon Prime accounts than go to church regularly or have a landline phone.[21] Prime membership is a paid subscription service for Amazon's retail customers that entitles them to several benefits, including free two-day shipping on Prime products.  According to a survey, an estimated 20% of Amazon Prime members shopped on Amazon a few times per week, and 7% did so almost daily.  Prime members in the United States spend an average of $1,400 per year on Amazon's platform. Another survey found that an astonishing *96%* of all

---

[20] https://www.digitalcommerce360.com/article/amazon-prime-membership/#:~:text=Amazon%20has%20147%20million%20Prime,to%20shareholders%20published%20April%2 015.

[21] Margot Whitney, Complete Beginner's Guide to Advertising on Amazon, Wordstream (Aug. 27, 2019),

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Prime members are more likely to buy products from Amazon's platform than any other online retail sales platform.[22]

39.     Amazon's market power is further entrenched by the powerful network effects that shape online retail sales platforms.  A network effect is the phenomenon by which the value or utility a user derives from a good or service depends on the number of users of the same good or service. An online retail sales platform is not valuable to consumers if no retailers list their products on it, and it is not valuable to retailers if no consumers shop there. Conversely, Amazon's tremendous advantage in the number of retailers who list their products on the Amazon platform draws *hundreds of millions* of consumers to the platform, and this massive audience in turn compels retailers to list products there.  As noted, third-party merchants consistently report that market realities "force[ them] to be on Amazon" and that they "don't have a choice but to sell through Amazon." *Id.* at 87, 270.

40.     For example, Molson Hart, who sells toys on Amazon reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3–6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."

41.     Amazon also has even greater monopoly power in specific submarkets of the online retail sales market. For example, Amazon currently enjoys an overwhelming share of the online retail sales market in the following categories of goods: home improvement tools (93%); men's athletic shoes (74%), skin care (91%), batteries (97%), golf (92%), cleaning supplies (88%), and kitchen and dining (94%).[23]

---

[22] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, Forbes (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.
[23] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://marketingland.com/amazon-owns-more-than-90-market-share-across-5-different-productcategories-report-241135.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**B.      Amazon Imposes Most Favored Nation Requirements On Third-Party Merchants.**

42.      Amazon has achieved and maintained market dominance through the contractual controls it exercises over the prices its third-party merchants can offer on competing online retail sales platforms.

43.      Before March 2019, Amazon required its third-party merchants to agree to Amazon's "Price Parity Clause." The Price Parity Clause (also known as a "Most Favored Nations" clause or "MFN") explicitly prohibited third-party merchants from offering consumers lower prices on any alternative online platform including their own websites.

44.      Amazon's Price Parity Clause restricted and suppressed price competition in two ways.

45.      *First*, the Price Parity Clause prohibited third-party merchants from lowering their prices on other online retail sales platforms.  But for Amazon's MFN clause, Amazon's higher fees would result in consumers paying a higher overall price on Amazon's platform than on competing platforms.  Competitive pressure would then have forced Amazon to lower its fees.  By eliminating price competition across platforms, Amazon protected its ability to charge supracompetitive fees for the use of its platform, keeping prices high on its platform and, therefore, across all online retail sales platforms.

46.      *Second*, Amazon eliminated horizontal price competition between its own goods and the directly competing goods of the third-party merchants that would otherwise have been sold at lower prices, not only on competing online platforms and the merchants' websites, but also on Amazon's own platform. Without the Price Parity Clause, Amazon would have had to offer lower prices for its own goods to compete with the lower-priced third-party-merchant goods.

47.      Economic literature teaches that MFN clauses typically result in noncompetitive fees, because they discourage the entry of new platforms that would otherwise challenge the


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

incumbents by offering sellers lower fees.[24]  Walmart, Amazon's closest direct competitor, charges referral fees similar to Amazon's across the same product categories. This synchronization of referral fees between Amazon and Walmart suggests that the higher-price structure imposed by Amazon has spread to competing online marketplaces:

| Item Category | Amazon | Walmart |
|---|---|---|
| Men's athletic shoes (Shoes) | 15% < $75.00, 18% > $75.00 | 15% |
| Kitchen and Dining | 15% | 15% |
| Home Improvement Tools | 15%, 12% for base equipment | 15% |
| Apparel and Accessories | 17% | 15% |
| Electronics | 8% | 8% |
| Beauty Products | 8% < $10.00, 15% > $10.00 | 15% |
| Books | 15% | 15% |
| Furniture & Décor | 15% < $200.00, 10% > $200.00 | 15% |
| Grocery & Gourmet Food | 8% < $15.00, 15% > $15.00 | 15% |
| Personal Computers | 6% | 6% |
| Camera and Photos | 8% | 8% |
| Automotive & Powersports | 12% | 12% |
| Baby Products | 8% < $10.00, 15% > $10.00 | 15% |
| Jewelry and Watches | 20% < $250.00, 5% > $250.00 | 20% |
| Toys and Games | 15% | 15% |
| Everything Else | 15% | 15% |

48.     Market analyst Simeon Siegel notes that "although every unit sold through 3P . . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow even when selling fewer of its own goods.[25] For example, Amazon generated $43 billion in third-party merchant service revenues in 2018, which accounted for the second-largest revenue segment of the online retail platform, after Amazon's own retail product sales.[26]

---

[24] Andre Boik and Kenneth S. Corts, The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry, The Journal of Law and Economics 59, no. 1 (February 2016): 105-134; UK Office of Fair Trading, Can "Fair" Prices Be Unfair? A Review of Price Relationship Agreements, Paper No. 1438 (Sept. 2012), https://www.jura.uniwuerzburg.de/fileadmin/02140600/Aktuelles/2012-10-24_-brit._Kartellbehoerde/OFT1438.pdf.
[25] *Supra* Howland.
[26] J. Clement, *Percentage of paid units sold by third-party sellers on Amazon platform as of 4th quarter 2019*, Statista (Jan. 31, 2020), https://www.statista.com/statistics/259782/third-partyseller-share-of-amazon-platform/.

49.     Collectively, the third-party merchant fees Amazon charges are substantial and built into the prices its third-party merchants charge their customers for products purchased on Amazon's platform. Because Amazon's pricing policies do not permit its third-party merchants to sell at lower prices on other platforms, these fees are also baked into the prices they offer on other platforms, i.e., throughout the online retail sales market.

50.     For example, retailer Molson Hart reports that a $150 item sold on Amazon would make his company the same profit as an item sold for approximately $40 less on his company website:

> We designed, manufactured, imported, stored, shipped the item, and then we did customer service. Amazon hosted some images, swiped a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be $40 cheaper. And this is how Amazon's dominance of the industry hurts consumers.[27]

51.     This is a direct consequence of Amazon's price policies for its third-party merchants, *i.e.*, its former MFN clause, the Price Parity Clause, and its current, nearly identical Fair Pricing Policy. And these policies are not merely theoretical but rather have been aggressively enforced. To ensure compliance with the MFN clause, Amazon's "automated system continually check[ed] and inform[ed] the seller within 15 minutes if a violation has occurred."[28] If a third-party merchants was found in violation, it received a policy warning in the seller's central account.[29] Violations could result in removal of the third-party merchant's product listing or suspension of the merchant's account.[30] It was reported that "Amazon even checks [the third-party merchant's] listings for similar products that are differently described, by

---

[27] *Supra* Hart.
[28] Rupert Heather, The Little-Known Amazon Pricing Rule that Would Burn Your Business, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.
[29] *Id*.
[30] Sarah Sayed, 5 Pricing Do's and Don'ts on Amazon and Walmart Marketplace, Worldfirst Blog (Apr. 11, 2018), https://www.worldfirst.com/us/blog/selling-online/5-pricing-dos-dontsamazon-walmart-marketplace/. Amazon's contracts with its third-party merchants are confidential. Plaintiffs therefore rely on publicly available third-party sources for their content.



color or size, for example. In other words, there's no hiding place."[31] As one advisor phrased it, "[I]f you get caught, Amazon won't hold back from enforcing penalties or suspensions."[32] Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's nothing you can do."[33] To ensure that they are in compliance with Amazon's price policies, some third-party merchants have come to rely on an external service to replicate their prices across multiple marketplaces.[34]

52.    "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[35] But Amazon's MFN clause had the effect of reducing price competition. Third-party merchants, who would have sold their products for less, including on their own websites (e.g., by avoiding Amazon's estimated 15% referral fee),[36] were prevented from selling at lower prices.[37]

53.    Amazon came under fire for its MFN clause in December 2018, when Senator Blumenthal called for an FTC investigation of the practice.[38] Years earlier, Amazon withdrew this very practice in Europe under pressure from British and German regulators.[39] In response to the Blumenthal letter, Amazon also quietly withdrew its MFN clause in the United States in March of last year.[40] At the time, Dani Nadel, president of Feedvisor, a company that advises

---

[31] *Supra* Heather.

[32] *Supra* Sayed.

[33] *Supra* Soper & Brody.

[34] *Supra* Heather.

[35] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell A Product For?*, Feedvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazonpricing-strategy/.

[36] What it costs to sell on Amazon in 2018, Xsellco, https://www.xsellco.com/resources/amazon-seller-fees-2018/; supra Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[37] Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.

[38] *Id*.

[39] *Id*.

[40] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazonreportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Amazon third-party merchants, expected it to be a watershed moment that would lead "the greater e-commerce landscape" to be "much more dynamic."[41] Likewise, when he learned that Amazon was revoking its MFN clause, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported: "I almost did a back flip in the hotel gym."[42]

54.    But the watershed moment never came. Instead, Amazon continues to punish retailers, who price products lower on other sites.[43] While Amazon withdrew its MFN clause, it continues to enforce its Fair Pricing Policy, which has the same effect as its former MFN clause.[44] Whereas the MFN clause specifically prohibited third-party merchants from offering cheaper deals through competing online retail sales platforms, the Fair Pricing Policy prohibits pricing that "harms consumer trust," which Amazon then interprets to impose the same requirements.  Failure to comply with this interpretation results in stiff penalties, such as Amazon removing the "Buy Box" from the relevant product page, suspending shipping options, and even terminating the third-party merchant's selling privileges.[45]

55.    The "Buy Box" is the white box on the right side of the product details page where shoppers can click "Add to Cart" or "Buy Now." It is a critical listing benefit for third-party merchants: Buy Box products are the most visible to consumers and the easiest for them to purchase. Over 80% of Amazon purchases made on desktops are done via the Buy Box, and due to the smaller screen size of mobile devices, an even higher percentage of mobile Amazon purchases are made through the Buy Box.[46]

---

[41] *Supra* Howland.
[42] *Supra Gonzalez.*
[43] *Supra* Hart; *supra* Gonzalez.
[44] *Supra Gonzalez.*
[45] *Id.*
[46] Conor Bond, *Why You Need the Amazon Buy Box and How to Get It*, Ecommerce Strategy, https://www.wordstream.com/blog/ws/2018/10/03/amazon-buy-box; Meyers Soap entry on Amazon, www.amazon.com/Mrs-Meyers-Clean-Day-Lavender/dp/B01N1N6FMZ (retrieved March 9, 2020).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



56.     Eligibility for the Buy Box depends on a number of factors, including the third-party merchant's reputation, price, efficiency, and whether the merchant is selling its product for a lower price through competing online retail sales platforms.[47] When users click the "Add to Cart" button on Amazon's platform, they are buying from one merchant and one merchant only—the Buy Box winner.[48] Similarly, when a user selects the "Buy Now" button, that will also lead to the Buy Box owner.[49] Over 90% of sales occur using the Buy Box.[50]

57.     Having the Buy Box provides tremendous value to third-party merchants. For example, retailer David Simnick reports that his sales plunge as much as 40 or 50 percent in a single day when his listings lose the Buy Box because of pricing products for less on alternative platforms. He is able to reclaim the Buy Box only if he changes product pricing so that he is no longer offering a lower price on other online retail platforms than on Amazon.[51] Despite the

---

[47] Leanna Zeibak, *7 steps to Winning the Amazon Buy Box in 2019*, Tinuiti (Aug. 14, 2018), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Supra* Gonzalez.

official withdrawal of Amazon's MFN clause, Amazon continues to strip his listing of the Buy Box if products are sold elsewhere for even $1 less than on Amazon.[52]

58.     Molson Hart, whose company Viahart sells toys online, says that 98% of its sales come from Amazon's platform and that other platforms like eBay and Walmart account for less than 2% of his company's revenue. *Supra* Soper & Brody. He also found that even after Amazon officially ended its MFN clause, it continued to punish third-party merchants who list prices on other websites for less than the price on Amazon: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[53]

59.     Amazon is not just an online retailer, it is also a data aggregator. It compiles a massive set of consumer data based on its retail customers' shopping information, including minutiae such as how long a consumer considers a product.[54] Former Amazon employees have reported that the internal data Amazon compiles is much more sophisticated than the information available in the public domain, or any third-party tools built for third-party merchants.[55] This massive data collection has helped Amazon evolve into a giant among online retail stores by collecting, storing, processing, and analyzing personal information from its retail customers to determine how they are spending their money.[56] This data advantage also allows it to extract maximum profit from consumers by setting the price of its products and platform fees to leverage its market power.

---

[52] *Id.*
[53] *Supra* Hart.
[54] Amazon Privacy Notice, https://www.amazon.com/gp/help/customer/display.html?nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B4AE2BEB14AF4F01.
[55] Krystal Hu, *Revealed: How Amazon uses third-party seller data to build a private label juggernaut*, Yahoo Finance (Sept. 27, 2019).
[56] Jennifer Wills, 7 Ways Amazon Uses Big Data to Stalk You (AMZN), Investopedia (Oct. 20, 2018), https://www.amazon.com/gp/help/customer/display.html?nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B4AE2BEB14AF4F01.

60.     Amazon regularly uses it massive data aggregations capabilities to monitor the prices that other online retail sales platforms offered to U.S. customers both by its external competitors and its third-party merchants,[57] and it regularly enforces its MFN Clause, often within 15 minutes of discovering a price differential. The enforcement and threat of enforcement has regularly prevented its third-party merchants from offering lower prices through competing platforms.[58]

## C.     Amazon's Pricing Policies Restrain Price Competition and Cause Consumers to Pay More.

61.     Amazon's price policies have an anticompetitive effect because they eliminate price competition from third-party merchants across the U.S. online retail sales market. Selling on Amazon Marketplace is not cheap, so to make up for the fees, third-party merchants must increase prices on Amazon's platform.[59] And Amazon's price policies require third-party merchants to sell at these elevated prices on other online retail sales platforms, as well, which results in reduced price competition and higher online prices for consumers.

62.     Absent Amazon's anticompetitive price policies, third-party merchants would set lower prices on platforms with lower fees than Amazon's. Price is highly material factor for consumers shopping on online retail platforms. Therefore, Amazon would face significant competitive pressure if retailers were allowed to consistently offer lower prices on competing platforms. That competitive pressure would force Amazon to lower the referral fees it charges, which are currently set higher than the market would have allowed in the presence of full competition. Had Amazon charged a competitive referral fee rather than a supracompetitive referral fee, consumers would have paid less to purchase products from third-party merchants on Amazon's platform. Market forces would also have forced Amazon to lower the prices it charges for its own products in response to the lower prices being charged by competing retailers both on and off the Amazon platform.

---

[57] *Supra* Sayed, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*.
[58] *Supra* Heather.
[59] *See, e.g.*, *supra* Hart.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   63.     Consumers who purchased products offered by Amazon's third-party merchants

2   on other platforms were also injured because they purchased the products at prices artificially

3   inflated by Amazon's anticompetitive price policies. For example, a customer, who purchased a

4   $150 toy on Viahart.com (the same price concurrently offered on Amazon's platform) paid

5   approximately $40 more for the toy than if the third-party merchant had not had to abide by

6   Amazon's price policies requiring price parity; the third-party merchant could have sold the

7   product for $40 less on its own website while making the same profit.[60] Amazon's Fair Pricing

8   Policy has a broad reach, encompassing virtually all consumer products. Consumers who make

9   purchases on competing online retail sales platforms of any of the hundreds of millions of

10  products concurrently offered on Amazon's platform are likely to be injured in the future by

11  Amazon's current Fair Pricing Policy.

12  **D.    Government Authorities Have Repeatedly Concluded That Amazon Has Harmed
        Competition Through the Use of Most Favored Nation Pricing Policies.**

13

14  64.     Last summer, the Subcommittee on Antitrust, Commercial, and Administrative

15  Law of the Committee on the Judiciary conducted an extensive investigation of Amazon's

    pricing policies governing third-party merchants. The resulting House Report concluded that

16  "Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party

17  merchants can collaborate with an existing or potential competitor to make lower-priced or

18  innovative product offerings available to consumers."

19
    65.     The House Report rejected Amazon's claims that it competes with retailers
20
    outside the online retail sales market, explaining that "[t]his approach is inconsistent with
21
    evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product
22
    markets, and common sense."[61]  The House Report further noted the FTC's recent conclusion
23
    that a "relevant market may be divided by channel of sale, resulting in separate markets for
24
    brick-and-mortar sales and online sales."[62]
25

26  [60] Id.
    [61] Id. at 255.
27  [62] Id.

28

CLASS ACTION COMPLAINT - 21
Case No.

66.     Referring to the online retail sales market, the House Report further concluded that "Amazon functions as a gatekeeper for ecommerce."[63] Further, "Amazon has monopoly power" over most third-party merchants who feel they "cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated."[64]

67.     The House Report further found that "Amazon also enjoys significant market power over online consumers" that "is durable and unlikely to erode in the foreseeable future."[65] This durable market power reflects significant barriers to entry that include: "(1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery."[66]

68.     The German antitrust authority—the Bundeskartellamt—has already found that Amazon's PMFN clause harms consumers with anticompetitive overcharges.

69.     In Germany, Amazon was a less commanding market leader, with a relatively low 30-40% share of the market for the online sales of goods. Nevertheless, the German antitrust authority took action against Amazon for the PMFN clause at issue here:  "the so-called price parity clause," which "largely prevented sellers on Amazon's Marketplace platform from offering their goods elsewhere online at a lower price," whether on "other e-commerce platforms" or on their "own online shops."

70.     Upon investigation, the German authority concluded that "Amazon and the third-party retailers are direct competitors" in e-commerce, that "[t]he price parity clause is a hardcore restriction which is not indispensable for Marketplace efficiencies and does not allow consumers a fair share of the resulting benefit," and that "[t]he agreement of a price parity

---

[63] *Id.* at 256.
[64] *Id.*
[65] *Id.* at 260.
[66] *Id.*

CLASS ACTION COMPLAINT - 22
Case No.

HAGENS BERMAN

clause constitutes horizontal price-fixing." The German authority further concluded that the scope of that horizontal price-fixing agreement was market-wide: because "[a] general competitive relationship exists between Amazon and the third-party sellers in the retail markets in all product categories," "the price parity clause is a hardcore restriction in all product categories."

71.     The German authority also found that Amazon's PMFN clause had the stark anticompetitive effect economic literature predicts: reduced competition and higher prices. Because Amazon's PMFN restriction ensures a uniform all-in price to the end consumer, the "[p]rice parity clauses thus act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market" by "neutrali[zing]" the "major competitive parameter – the fees for platform services – . . . more favourable fees cannot be translated into more favourable prices for final customers." The inevitable result is higher prices. "According to a poll of 2,500 online retailers carried out by the Bundeskartellamt, [the price parity clause] has also resulted in significant price increases to e-commerce."

72.     As a result of the German authority's findings, as well as coordinated efforts by other EU competition authorities, Amazon ultimately abandoned its PMFN clause on an EU-wide basis.

73.     Last summer, the Washington Post reported that the FTC planned to investigate Amazon as part of a broad investigation into the large technology companies.[67] This followed an earlier announcement that the FTC had established a special task force to monitor the big tech companies and to investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement actions when warranted."[68] According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up

---

[67] Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators*, Wash. Post (Jun. 1, 2019) https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightenedantitrust-scrutiny-under-new-agreement-between-us-regulators/.

[68] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  call to both Google and Amazon to behave themselves because it at least shows that the Justice

2  Department and FTC are thinking about them."[69]

3         74.    Vox reported that the FTC started questioning some of Amazon's competitors

4  last summer about its business practices, according to someone briefed on the discussions.[70]

5         75.    Bloomberg reported that FTC investigators began interviewing Amazon's third-

6  party merchants last fall as part of a sweeping probe to determine whether Amazon is using its

7  market power to hurt competition.[71] Reportedly, several attorneys and an economist have been

8  conducting interviews that typically last about 90 minutes.[72] According to Michael Kades, who

9  spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining

10  Amazon point to a serious inquiry rather than investigators merely responding to complaints and

11  going through the motions: "Early in an investigation, that's a sign of staff doing a serious job,"

12  Kades said. "They're spending lots of time with witnesses and trying to really understand what

13  they're saying."[73] Reportedly, regulators are skeptical that shoppers and suppliers have real

14  alternatives to Amazon.[74]

15         76.    Jennifer Rie, an analyst at Bloomberg Intelligence who specializes in antitrust

16  litigation, offered the opinion that FTC investigators are "in a background phase," when they are

17  "trying to learn as much as they can about the industry from people who aren't the target of their

18  investigation."[75]

19         77.    Diana Moss, president of the American Antitrust Institute, a nonprofit that

20  advocates for aggressive antitrust enforcement says that "the central question in an inquiry like

21  this" is whether "merchants are so reliant on Amazon for sales that they are unwilling to offer

---

[69] *Id.*

[70] Jason Del Rey, *Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it.*, Vox (Jun. 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.

[71] *Supra* Soper & Brody.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

HAGENS BERMAN

1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

better prices on other platforms like Walmart and EBay" and whether that can hurt competition.[76]

78.     The Free & Fair Markets Initiative, likewise, applauded the FTC's efforts: "It is welcome news to see that regulators are finally getting serious about taking on the unfair advantage Amazon has staked out on its Platform," said Robert B. Engel, a spokesperson for the group, in a statement.[77]

79.     The Attorney General for the District of Columbia filed a sovereign enforcement action against Amazon for violations of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*[78] Like Plaintiffs, the Attorney General for the District of Columbia alleges that Amazon restrains third-party merchants from offering their products on any other online retail sales platform— including third-party merchants' own platforms—at prices lower, or on better terms, than they offer their products on Amazon's online retail sales platform, and that this conduct causes prices to consumers across the online retail sales market to be higher than they would be otherwise.

## VI.     INTERSTATE TRADE AND COMMERCE

80.     Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a platform for its third-party merchants across, and without regard to, state lines.

## VII.     RELEVANT MARKETS

81.     Amazon has monopoly power in the market for online retail platforms in the United States and uses this power to restrain prices, resulting in injuries to consumers.  Amazon further has monopoly power market in the market for online retail sales in the United States, as well as the following submarkets of the online retail sales market:

            (a) home improvement tools,

---

[76] *Id.*

[77] Ben Fox Rubin, *FTC investigation into Amazon reportedly gearing up*, C/net (Sept. 11, 2019), https://www.cnet.com/news/ftc-investigation-into-amazon-reportedly-gearing-up/.

[78] *District of Columbia v. Amazon.com, Inc.*, No. _____, Superior Court of the District of Columbia, Civil Division, filed May 25, 2021).

CLASS ACTION COMPLAINT - 25
Case No.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(b) men's athletic shoes,

(c) skin care,

(d) batteries,

(e) golf,

(f) cleaning supplies, and

(g) kitchen and dining products (collectively the "Identified Sub-markets").

82.     As multiple authorities have recognized, the online retail sales market is separate and distinct from the physical, brick-and-mortar retail sales market. The FTC has recognized that a relevant market may be divided by channel of sale resulting in separate markets for brick-and-mortar sales and online sales. The House Report concluded that the online retail sales market was a distinct market and that Amazon controlled 70% of it. House Report at 255. The U.S. Department of Commerce tracks online retail sales as a separate category, acknowledging its distinction from physical retail sales.

83.     Economists agree that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[79] An online channel has distinct characteristics from a physical channel.[80] Yale economist Fiona Scott Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[81] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and, "with the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[82]

---

[79] Forsythe, S.M., & Shi, B. (2003). *Consumer patronage and risk perceptions in Internet shopping*. Journal of Business Research 56, 867 – 875 at 874.

[80] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision*. Asian Journal of Business Research, 1(2), 66-74.

[81] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

[82] *Id.*



84.     Furthermore, U.S. retailers also agree that the online retail sales market is separate from the physical, brick-and-mortar retail sales market. Only 28% of small businesses sell online.[83] Established large brick-and-mortar retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[84] 4% for Costco,[85] and 3% for Walmart.[86] Online retailers commonly advertise only online, whereas store retailers advertise both on and offline.[87] Unlike brick-and-mortar stores, online retailers do not have a way to take payment by cash or checks.[88] Brick-and-mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for online retail sales is typically less comprehensive or effective.[89]

85.     Finally, U.S. consumers distinguish between online retail and brick-and-mortar retail. As a practical matter, the online retail sales market requires access, usually through a personal computer, smart phone or tablet, and most, but not all U.S. consumers have that access.[90] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying or to buy

---

[83] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, Forbes, May 17, 2018, https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[84] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, Geekwire, Mar. 5, 2019, https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[85] *Trefis Team, How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, Forbes, Nov. 27, 2017, https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[86] Ecommerce accounts for 4% of Costco's sales and is growing 12%, https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

[87] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RetailNext, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

[88] *Id.*

[89] *Id.*

[90] Aaron Smith and Monica Anderson, *Online Shopping and E-Commerce, Pew Research Center*, Dec. 19, 2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over ecommerce.[91]

86.    Indeed, Amazon appears to concede this distinction between online retail and brick-and-mortar retail.  Tellingly, Amazon's MFN clauses only dictate what third-party merchants can do on other *online* retail sales platforms, but do not apply to physical retail sales.

87.    Amazon's restraints on competition directly impact each of the markets stated above. Amazon harms consumers by imposing a price floor condition on its two million third-party merchants that results in supracompetitive prices for goods sold on other online retail sales platforms. While harming consumers and competition, Amazon itself benefits from its pricing policies. By avoiding head-to-head competition from lower priced products on competing online retail sales platforms, Amazon is able to prop up the supracompetitive referral fees it charges for use of its platform. Amazon's price restraints also allow Amazon to prop up the prices it can charge for products Amazon itself sells on its platform.

88.    Plaintiffs seek relief on behalf of themselves and other purchasers of products on Amazon's platform.

89.    Eliminating Amazon's anticompetitive pricing policies would not lead to any discernible negative effects on either third-party merchants or consumers. For example, unlike credit-card transaction platforms, allowing third-party merchants to compete on price through competing online retail sales platforms would not reduce the money available to pay rebates or rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

90.    Amazon's price policies are also not needed to prevent free riding from third-party merchants, from whom Amazon already collects substantial fees. Nor are they needed to combat free riding from consumers. Many regular Amazon customers already pay substantial fees for their Prime membership, and Amazon dominates consumers' online searches of retailer websites, creating an "information bottleneck" that prevents many consumers from ever receiving competitive price information from other sources.

---

[91] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

91.     Amazon can point to no legitimate considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

## VIII.   CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal law and pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following Class:

> All persons who on or after May 26, 2017, purchased one or more products through Amazon's platform.

93.     Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the class are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities. Further excluded from the class are individuals who are already pursuing antitrust claims based on Amazon's MFN clause on their individual behalf in arbitration before the American Arbitration Association.

94.     The identity of all Class members are readily identifiable from information and records maintained by Defendant.

95.     **Numerousity:** Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are more than a hundred million members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

96.     **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

97.     **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

98.     **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in Defendant's wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same anticompetitive conduct alleged herein.

99.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)     Whether Defendant and its third-party merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing under Amazon's former MFN clause that third-party merchants would not sell their products to buyers through competing online retail sales platforms at a price lower than what they offered on Amazon's platform;

(b) Whether Defendant and its third-party merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that third-party merchants would be penalized under Amazon's current "fair pricing" policy if they offered their products to buyers through competing online retail sales platforms at a lower price than what they offered on Amazon's platform;



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(c) Whether Defendant has unlawfully monopolized, or attempted to monopolize, the U.S. online retail sales market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

(d) Alternatively, whether Defendant has unlawfully monopolized the Identified Submarkets within the U.S. online retail sales market, i.e., U.S. online retail sales of home improvement tools, men's athletic shoes, skin care, batteries, golf, cleaning supplies, and kitchen and dining products;

(e) Whether competition in the U.S. online retail sales market or any of the Identified Submarkets has been restrained and harmed by Amazon's monopolization, or attempted monopolization, of these markets;

(f) Whether consumers and Class members have been damaged by Defendant's conduct;

(g) The amount of any damages; and

(h) The nature and scope of injunctive relief necessary to restore a competitive market.

100. **Injunctive relief:** By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

101. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on behalf of the Class members are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Resolution of the Class members' claims through the class action device will present fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.

## IX.   ANTITRUST INJURY

102. During the Class Period, Plaintiffs and Class members directly purchased products on Amazon's Platform. Because of Defendant's anticompetitive conduct, Plaintiffs and

Class members were forced to pay more for those products than they would have if Amazon had permitted its third-party merchants to engage in price competition outside Amazon's Platform. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues to enforce its anticompetitive "fair pricing" policy, Plaintiffs and Class members are reasonably likely to incur future overcharges when they purchase products on Amazon's platform. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal antitrust laws, including its anticompetitive agreement with its third-party merchants, its monopolization, or its attempted monopolization of the relevant markets, as alleged herein. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1) *PER SE*

103.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

104.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed Class described above.

105.    Defendant's third-party merchants are its direct competitors in the online retail sales market in the United States. As a participant in the online retail sales market, Defendant directly offers for sale a broad range of goods on Amazon's Platform. On information and belief, all products offered by third-party merchants on Amazon's Platform are reasonably interchangeable with one or more products that Amazon directly sells on its Platform, such that there is cross-elasticity of demand between Defendant's products and the products that its third-party merchants offer on Amazon's Platform. Stated otherwise, all the products sold by third-party merchants on Amazon's Platform compete with one or more of Amazon's own products that it also sells on its Platform.



106.    The products sold by third-party merchants are therefore reasonably interchangeable with products sold directly by Defendant on Amazon's Platform, such that there is cross-elasticity of demand between Defendant's products and the products of third-party merchants.

107.    Because Defendant has engaged in horizontal price-fixing, which is a per se violation of the Sherman Act, no relevant market need be defined to establish liability under the Sherman Act. To the extent a market definition is required, the relevant market is the online retail sales market in the United States.

108.    In violation of Section 1 of the Sherman Antitrust Act, Defendant entered into a horizontal agreement with its two million third-party merchants on Amazon Marketplace concerning the price they were allowed to sell their products in the United States. Specifically, Defendant and its contractual partners unlawfully agreed under Amazon's former MFN clause that third-party merchants will not offer their products to their customers in the U.S. online retail sales market at a price lower than the price they offer them on Amazon's Platform, and under Amazon's current Fair Pricing Policy, Amazon and its contractual partners unlawfully agree that any third-party merchant, who offers its products to its customers at a price lower than the price it offers them on Amazon's Platform, will be subject to severe penalties, including rendering the merchant's products ineligible for Amazon's Buy Box or suspending or terminating the merchant's account with Amazon. These unlawful agreements have unreasonably restrained price competition among retailers for online sales of consumer goods and had the effect of establishing a floor price for sales of products offered on Amazon's platform. This combination is per se unlawful price-fixing.

109.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for consumer products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

110.    Plaintiffs and Class members are direct purchasers because they directly purchase products on Amazon's platform and directly pay Amazon's referral fees.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

111. Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### SECOND CAUSE OF ACTION

### VIOLATION OF 15 U.S.C. § 1
### (ALTERNATIVE TO *PER SE*)

112. Plaintiffs repeat and re-make every allegation above as if set forth herein in full. This Count is brought in the alternative if the agreement between Amazon and its co-conspirator, third-party merchants is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation.

113. Plaintiffs bring this federal law claim on his own behalf and on behalf of each member of the proposed nationwide Class described above.

114. Defendant's MFN and "fair pricing" policy have an open and obvious adverse effect on competition. They raise prices and act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market. This is because the major competitive parameter – the fees for platform services – is neutralized by the PMFN and "fair pricing" policy, since more favorable fees cannot be translated into more favorable prices for final customers. This raises market prices and prevents competitors from establishing a greater reach.

115. Amazon's MFN and "fair pricing" have actual detrimental effects. They cause prices to be higher in each of the markets alleged above than they would have been in the absence of Amazon's price restraints. These anticompetitive agreements further exclude the entry and growth of competitor platforms in the online retail market and decrease innovation and consumer choice in the relevant markets.

116. A straightforward application of fundamental economic principles shows that the arrangements in question would have an anticompetitive effect on customers and the relevant market.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

117.    Defendant and its co-conspirator, third-party merchants did not act unilaterally or independently, or in their own economic interests, when entering into the agreements. The agreements, and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant market, and harmed Plaintiffs and the Class thereby.

118.    Defendant is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" or rule of reason standard.

119.    Defendant possesses market power. In 2018, for example, retail sales on the Amazon platform represented 49% of all sales in the online retails sales market in the United States. Ebay, the next largest competitor, had less than 7%. Today, Amazon controls between 65% and 70% of online retail sales market in the United States.  That Amazon has market power is evident from the power it has to raise prices above those that would be charged in a competitive market.

120.    Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers.

121.    Amazon's relationship with its co-conspirator, third-party merchants is further evidence of its market power. It has the power to dictate and arbitrarily change the rules by which its co-conspirator, third-party merchants have access to the Amazon.com platform, *e.g.*, extending the amount of time business buyers have to pay its co-conspirator, third-party merchants, deciding what products they can sell and whether they can participate as vendors or third-party merchants, and bends the rules to give itself the advantage in the Buy Box and in the sponsored advertising. Amazon charges them exorbitant fees that give Amazon a competitive advantage over its co-conspirator, third-party merchants and uses their supplier information to contract directly with the supplier and their customer information to decide what areas to focus its retail or product developments.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

122.    There is no legitimate, pro-competitive business justification for Amazon's MFN and fair pricing agreements or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

123.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for products purchased on the Amazon platform than they would have paid in the absence of Defendant's unlawful conduct.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2)

124.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

125.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

126.    The relevant market is the online retail sales market in the United States.

127.    Defendant obtained monopoly power in the online retail sales market in the Unites States, as demonstrated by its power to set the prevailing prices of virtually every good offered for sale in in that market.

128.    Alternatively, the relevant markets are the following sub-markets, in which Defendant, inclusive of its third-party merchants, holds the following market share: home improvement tools (93%); men's athletic shoes (74%), skin care (91%), batteries (97%), golf (92%), cleaning supplies (88%), and kitchen and dining (94%).[92]

129.    Defendant obtained and exercises monopoly power in the identified sub-markets, as demonstrated by its power to set the prevailing prices of virtually every good offered for sale in each of these markets.

---

[92] Amy Gresenhues, *Amazon Owns More Than 90% Market Share Across 5 Different Product Categories [Report]*, Marketing Land (May 31, 2018), https://marketingland.com/amazon-owns-more-than-90-market-share-across-5-different-productcategories-report-241135.



130.    Amazon has gained and maintains monopoly power in the applicable markets by improper and unlawful means.

131.    Defendant has willfully acquired its monopoly power in the applicable markets in part through its enforcement of its former MFN clause and its current Fair Pricing Policy. These provisions establish a price floor based on the third-party merchant's price listing on Amazon's Platform. By requiring its two million third-party merchants to apply a price floor on all other online retail sales platforms, Defendant largely immunizes these products from competitive pricing in the relevant market and causes the products on Amazon's platform to be sold at supracompetitive prices.

132.    Plaintiffs and Class members are direct purchasers because they directly purchase products on Amazon's platform and directly pay Amazon's referral fees.

133.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for products on Amazon's platform than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

134.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

135.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

136.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

137.    If Defendant does not already have a monopoly in the online retail sales market in the United States or the submarkets identified above, it has attempted to monopolize these markets.

138.    Amazon's MFN clause and its current Fair Pricing Policy demonstrate Amazon's intent to control online prices of virtually every consumer good offered in the relevant market.



HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

139.     Through its enforcement of its MFN clause and its current Fair Pricing Policy, Defendant has furthered its goal of controlling prices of virtually every consumer good offered in the applicable markets.

140.     There is a dangerous probability that Defendant will succeed in monopolizing the applicable markets. Defendant, inclusive of its third-party merchants, already accounts for 50% to 70% of the online retail sales market in the United States.

141.     Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for products on Amazon's platform than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

142.     Plaintiffs and Class members are direct purchasers because they directly purchase products on Amazon's platform and directly pay Amazon's referral fees.

143.     Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY TRIAL DEMANDED

144.     Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.     Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   D.   Adjudication that the acts alleged herein violate the state laws alleged herein;

2   E.   Actual damages, statutory damages, punitive or treble damages, and such other

3   relief as provided by the statutes cited herein;

4   F.   Pre-judgment and post-judgment interest on such monetary relief;

5   G.   Equitable relief in the form of restitution and/or disgorgement of all unlawful or

6   illegal profits received by Defendant as a result of the anticompetitive conduct alleged herein;

7   H.   Equitable relief requiring that Amazon cease the abusive, unlawful, and

8   anticompetitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*,

9   15 U.S.C. § 26), as requested he therein;

10   I.   The costs of bringing this suit, including reasonable attorneys' fees; and

11   J.   All other relief to which Plaintiffs and members of the Class may be entitled at

12   law or in equity.

13   DATED: May 26, 2021          Respectfully submitted,

14

HAGENS BERMAN SOBOL SHAPIRO LLP

15

By ___ */s/Steve W. Berman*

16        Steve W. Berman (WSBA No. 12536)
By     */s/ Barbara A. Mahoney*

17        Barbara A. Mahoney (WSBA No. 31845)

18   1301 Second Avenue, Suite 2000
Seattle, WA 98101

19   Telephone: (206) 623-7292
Facsimile: (206) 623-0594

20   steve@hbsslaw.com
barbaram@hbsslaw.com

21

22   KELLER ROHRBACK L.L.P.

By___ */s/ Derek W. Loeser*

23        Derek W. Loeser (WSBA No. 24274)
1201 Third Avenue, Suite 3200

24   Seattle, WA 98101-3052
Telephone: (206) 623-1900

25   Facsimile: (206) 623-3384
Dloeser@kellerrohrback.com

26

27

28

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Zina Bash (pro hac vice to be filed)
KELLER LENKNER LLC
501 Congress Avenue, Suite 150
Austin, TX, 78701
Telephone: (512) 620-8375
zina.bash@kellerlenkner.com

Warren D. Postman (pro hac vice to be filed)
Albert Y. Pak (pro hac vice to be filed)
KELLER LENKNER LLC
1300 I Street N.W., Suite 400E
Washington DC, 20005
Telephone: (202) 749-8334
wdp@kellerlenkner.com
albert.pak@kellerlenkner.com

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT - 40
Case No.

